UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

MAURICE WIMBUSH,

                          PLAINTIFF,          **THIRD AMENDED COMPLAINT**

        -AGAINST-                                  17-CV-8765

NEW YORK CITY, NEW YORK CITY DEPARTMENT
OF HOMELESS SERVICES SERGEANT BRIAN
McCRAW, NEW YORK CITY DEPARTMENT OF
HOMELESS SERVICES SERGEANT MELISSA
McDOWELL, NEW YORK CITY DEPARTMENT OF
HOMELESS SERVICES POLICE OFFICER MAX
ASTUDILLO, NEW YORK CITY DEPARTMENT OF
HOMELESS SERVICES POLICE OFFICER THURMAN
HOCKADAY, NEW YORK CITY DEPARTMENT OF
HOMELESS SERVICES POLICE OFFICER JERVIS
HORTON, NEW YORK CITY DEPARTMENT OF
HOMELESS SERVICES POLICE OFFICER FRANCES
KELLY, NEW YORK CITY DEPARTMENT OF
HOMELESS SERVICES POLICE OFFICER MARSHA
LAMBERT, NEW YORK CITY DEPARTMENT OF
HOMELESS SERVICES POLICE OFFICER JEANNA
WATSON and NEW YORK CITY DEPARTMENT OF
HOMELESS SERVICES POLICE OFFICER AMOS
WOODS, individually, and in their capacity as members of
the New York City Department of Homeless Services
Police Force,

                                     DEFENDANTS.

------------------------------------------------------------------------ x

**PRELIMINARY STATEMENT**

1. This is a civil action in which Plaintiff, Mr. Maurice Wimbush, ("Mr. Wimbush"), seeks relief for the violation of his rights secured by 42 USC 1983, the Fourth and Fourteenth Amendments to the United States Constitution.

2. The claims arise from an incident on or about October 25, 2016, in which a member of the New York City Department of Homeless Services ("NYCDHS"), acting under color of state law, intentionally and willfully subjected Mr. Wimbush to *inter alia,* excessive force and false arrest.

3. Plaintiff seeks monetary damages (special, compensatory and punitive) against Defendants and an award of costs and attorneys' fees, and such other and further relief as the Court deems just and proper.

## JURISDICTION

4. This action is brought pursuant to 28 USC 1331, 42 USC 1983, and the Fourth and Fourteenth Amendments to the United States Constitution.

5. Venue is laid within the United States District Court for the Southern District of New York in that the events giving rise to the claim occurred within the boundaries of the Southern District of New York.

## PARTIES

6. Plaintiff, Mr. Wimbush, is a citizen of the United States and at the time of the incident described herein resided at the Schwartz Homeless Shelter, Wards Island, NY 10035.

7. New York City is a municipal corporation organized under the laws of the State of New York, which runs and operates the New York City Department of Homeless Services ("NYCDHS").

8. NYCDHS Sergeant Brian McCraw ("DHS Sergeant McCraw"), NYCDHS Sergeant Melissa McDowell ("DHS Sergeant McDowell"), NYCDHS Police Officer Max Astudillo ("DHS Officer Astudillo"), NYCDHS Police Officer Thurman Hockaday

("DHS Officer Hockaday"), NYCDHS Police Officer Jervis Horton ("DHS Officer Horton"), NYCDHS Police Officer Frances Kelly ("DHS Officer Kelly"), NYCDHS Police Officer Marsha Lambert ("DHS Officer Lambert"), NYCDHS Police Officer Jeanna Watson ("DHS Officer Watson"), NYCDHS Police Officer Amos Woods ("DHS Officer Woods") at all times here relevant were members of the NYCDHS, and are sued in their individual and professional capacity.

9. At all times mentioned, Defendants were acting under color of state law, under color of the statues, ordinances, regulations, policies, and customs and usages of the City of New York.

## FACTUAL ALLEGATIONS

10. Mr. Wimbush is 31-years old and suffers from bi-polar disorder.

11. On or about July 2016, Mr. Wimbush moved to the Schwartz Shelter on Wards Island.

12. On or about October 25, 2016, Mr. Wimbush was woken up at approximately 5:00 am by the staff at the shelter.

13. Mr. Wimbush was upset that the staff had woken up the residents at 5:00 am when the inspection was not due to start until 6:00 am.

14. Mr. Wimbush complained to a number of NYCDHS staff and NYCDHS officers.

15. DHS Sergeant McCraw then approached Mr. Wimbush and directed him to turn around.

16. Mr. Wimbush placed his hands on top of his head and asked why he had to turn around.

17. DHS Sergeant McCraw then drew a Conducted Electrical Weapon (CEW) and pointed it at Mr. Wimbush.

18. DHS Sergeant McDowell, DHS Officer Astudillo, DHS Officer Hockaday, DHS Officer Horton, DHS Officer Kelly, DHS Officer Lambert, DHS Officer Watson, and DHS Officer Woods were all present and all moved away from Mr. Wimbush.

19. DHS Sergeant McCraw then shot Mr. Wimbush in the chest with the CEW.

20. Mr. Wimbush felt immediate pain and a shock throughout his body.

21. The needles from the CEW stuck into Mr. Wimbush's chest.

22. Mr. Wimbush fell to the floor and passed out.

23. A number of the officers placed Mr. Wimbush on his side while he was unconscious on the floor.

24. When Mr. Wimbush woke up he was still lying on the floor.

25. Mr. Wimbush had been handcuffed behind his back.

26. Mr. Wimbush was eventually able to stand up.

27. Mr. Wimbush then saw DHS Sergeant McCraw and was extremely upset.

28. Mr. Wimbush spat at DHS Sergeant McCraw.

29. DHS Sergeant McCraw charged towards Mr. Wimbush, but was held back by other NYCDHS Officers.

30. Mr. Wimbush still had the needles from the CEW stuck in his chest.

31. Mr. Wimbush felt weak and drowsy.

32. An ambulance arrived and EMS officers strapped Mr. Wimbush to a stretcher.

33. NYCDHS Officers cuffed Mr. Wimbush's ankles.

34. Mr. Wimbush was strapped on the stretcher on top of his arms, causing severe pain to his wrists as a result of the handcuffs.

35. Mr. Wimbush asked for the handcuffs to be removed or loosened, but the request was denied by the NYCDHS Officers.

36. Mr. Wimbush was taken by ambulance to Harlem Hospital.

37. At the hospital the handcuffs were removed from Mr. Wimbush's wrists and the needles from the CEW were removed from his chest.

38. Mr. Wimbush was discharged from the hospital at approximately 7:00 am.

39. Mr. Wimbush was then handcuffed again by NYCDHS officers and informed that he was under arrest.

40. Mr. Wimbush was then taken back to the shelter dressed only in a hospital gown.

41. Mr. Wimbush asked for a shirt or sweater because it was cold, but NYCDHS Officers refused.

42. At approximately 12:00 pm Mr. Wimbush was taken to the 25th Precinct.

43. Mr. Wimbush again asked for a sweater, but was refused.

44. Mr. Wimbush also asked for his medication, but the NYCDHS officers refused that request as well.

45. Mr. Wimbush waited at the precinct for approximately four hours to be processed.

46. At approximately 4:00 pm, Mr. Wimbush was taken back to the shelter, then was taken to Central bookings.

47. Mr. Wimbush continued to request his medication, but was denied.

48. Eventually at approximately 4:00 am on October 26, 2017, Mr. Wimbush was taken to Bellevue Hospital.

49. Mr. Wimbush was assessed and given his medication for bi-polar.

50. At approximately 9:00 am on October 26, 2017, Mr. Wimbush was taken back to central bookings.

51. Mr. Wimbush was arraigned on charges of Harassment, Disorderly Conduct, Resisting Arrest, and Obstructing Governmental Administration.

52. The Criminal Court Complaint falsely stated that "the defendant's conduct created a public disturbance and inconvenience in that it caused a crowd to gather and obstruct the Callahan Inspection." This false statement was made by DHS Officer Horton.

53. The Criminal Court Complaint also falsely stated that "Officer Horton observed the defendant twist away from Sergeant McCraw, refuse to put his hands behind his back, and throw his arms up and down, making it difficult to handcuff him." This false statement was made by DHS Officer Horton.

54. Mr. Wimbush was released from central bookings at approximately 5:00 pm on October 26, 2017.

55. Mr. Wimbush suffered from severe physical pain in his wrists and chest for several days.

56. Mr. Wimbush was also extremely upset and suffered emotional distress as a result of this incident.

57. Mr. Wimbush had to return to court on numerous occasions until the case was ultimately dismissed on September 26, 2017.

58. Mr. Wimbush continues to feel traumatized by the events of October 2016.

59. Mr. Wimbush feels fear, embarrassment, humiliation, emotional distress, frustration, anxiety, and physical pain.

## FIRST CAUSE OF ACTION

(42 USC 1983 – False Arrest)

60. Plaintiff repeats and realleges each of the preceding allegations of this Complaint as if fully set forth herein.

61. Defendants have deprived Plaintiff of his civil, constitutional and statutory rights under color of law and are liable to Plaintiff under 42 USC 1983.

62. Defendants have deprived Plaintiff of his right to be free of unreasonable searches and seizures, pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, in that Plaintiff was falsely arrested by defendants.

63. Defendants confined Plaintiff.

64. Plaintiff was aware of, and did not consent to, his confinement.

65. The confinement was not privileged.

66. Plaintiff has been damaged as a result of Defendants' actions in an amount believed to equal or exceed the jurisdictional limit of this Court.

## SECOND CAUSE OF ACTION

(42 USC 1983 – Malicious Prosecution)

67. Plaintiff repeats and realleges each of the preceding allegations of this Complaint as if fully set forth herein.

68. Defendants have deprived Plaintiff of his civil, constitutional and statutory rights under color of law and are liable to Plaintiff under 42 USC 1983.

69. Defendants have deprived Plaintiff of his right to be free of unreasonable searches and seizures, pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, in that Plaintiff was maliciously prosecuted by Defendants.

70. The malicious prosecution was initiated by Defendants without legal justification and without probable cause, in that Defendants caused the commencement and continuation of criminal proceedings against Plaintiff, the proceedings terminated in favor of Plaintiff, and in that the action was commenced and continued intentionally and with malice and deliberate indifference to Plaintiff's rights.

71. Plaintiff has been damaged a result of Defendants' actions in an amount believed to equal or exceed the jurisdictional limit of this Court

### THIRD CAUSE OF ACTION

(42 USC 1983 – Excessive Use of Force)

72. Plaintiff repeats and realleges each of the preceding allegations of this Complaint as if fully set forth herein.

73. Defendants have deprived Plaintiff of his civil, constitutional and statutory rights under color of law and are liable to Plaintiff under 42 USC 1983.

74. Defendants have deprived Plaintiff of his right to be free of unreasonable searches and seizures, pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, in that Defendants used excessive and unreasonable force against Plaintiff.

75. Plaintiff has been damaged as a result of Defendants' actions in an amount believed to equal or exceed the jurisdictional limit of this Court.

## FOURTH CAUSE OF ACTION

(42 USC 1983 – Denial of Right to a Fair Trial: DHS Officer Horton)

76. Plaintiff repeats and realleges each of the preceding allegations of this Complaint as if fully set forth herein.

77. DHS Officer Horton deprived Plaintiff of his civil, constitutional and statutory rights under color of law and is liable to Plaintiff under 42 USC 1983.

78. DHS Officer Horton deprived Plaintiff of his right to a fair trial, pursuant to the Sixth and Fourteenth Amendments to the United States Constitution.

79. DHS Officer Horton created false information likely to influence a jury's decision and then forwarded that information to prosecutors, resulting in Plaintiff suffering a deprivation of liberty and a violation of his rights.

80. Plaintiff has been damaged as a result of DHS Officer Horton's actions in an amount believed to equal or exceed the jurisdictional limit of this Court.

## FIFTH CAUSE OF ACTION

(42 USC 1983 – Failure to Intervene: DHS Sergeant McDowell, DHS Officer Astudillo, DHS Officer Hockaday, DHS Officer Horton, DHS Officer Kelly, DHS Officer Lambert, DHS Officer Watson, and DHS Officer Woods)

81. Plaintiff repeats and realleges each of the preceding allegations of this Complaint as if fully set forth herein.

82. Defendant DHS Sergeant McCraw violated Mr. Wimbush's constitutional rights by using excessive force against Plaintiff, without legal justification.

83. DHS Sergeant McDowell, DHS Officer Astudillo, DHS Officer Hockaday, DHS Officer Horton, DHS Officer Kelly, DHS Officer Lambert, DHS Officer Watson, and DHS Officer Woods knew, or should have known, that DHS Sergeant McCraw did not have legal justification for the use of force against Plaintiff.

84. DHS Officer Astudillo, DHS Officer Hockaday, DHS Officer Horton, DHS Officer Kelly, DHS Officer Lambert, DHS Officer Watson, and DHS Officer Woods failed to intervene to prevent DHS Sergeant McCraw from using excessive force against Plaintiff.

85. DHS Officer Astudillo, DHS Officer Hockaday, DHS Officer Horton, DHS Officer Kelly, DHS Officer Lambert, DHS Officer Watson, and DHS Officer Woods had sufficient time to intercede and had the capability to prevent DHS Sergeant McCraw from using excessive force against Plaintiff and violating Plaintiff's Fourth Amendment rights.

86. Plaintiff has been damaged a result of the actions of Defendants DHS Officer Astudillo, DHS Officer Hockaday, DHS Officer Horton, DHS Officer Kelly, DHS Officer Lambert, DHS Officer Watson, and DHS Officer Woods in an amount believed to equal or exceed the jurisdictional limit of this Court.

**SIXTH CAUSE OF ACTION**

(42 USC 1983 – Monell Claim – Failure to Train)

87. Plaintiff repeats and realleges each of the preceding allegations of this Complaint as if fully set forth herein.

88. New York City failed to take the steps necessary to properly train, supervise or otherwise instruct its officers, including DHS Sergeant McCraw, in how to handle situations where a CEW is, or may be, deployed.

89. New York City knew, or should have known to a moral certainty, that DHS Sergeant McCraw would confront situations in which DHS Sergeant McCraw would consider deploying a CEW.

90. New York City has a policy regarding the use of CEWs as set out in the NYPD Patrol Guide Procedure Number 221-08.

91. The NYPD Patrol Guide Procedure 221-08 states that "a CEW should only be used against persons who are actively resisting, exhibiting active aggression, or to prevent individuals from physically injuring themselves or other persons actually present."

92. The NYPD Patrol Guide Procedure 221-08 also states: "It is prohibited to use a CEW in situations that do not require the use of physical force…It is prohibited to use the CEW on person as a form of coercion or punishment and on persons who passively resist."

93. New York City knew, or should have known, that the correct training and/or supervision could have helped DHS Sergeant McCraw comply with the NYPD policy regarding use of CEWs in situations where DHS Sergeant McCraw might face a difficult choice regarding the use of a CEW.

94. There is a documented history of NYPD officers mishandling situations where CEWs are deployed.

95. For example, in July 2014, Mr. Miguel Torruella, who is autistic, was shot by an NYPD officer with a CEW. Mr. Torruella was unarmed at the time. The incident was

reported by various media sources, including the New York Times and the NY Daily News.

96. On or about March 27, 2016, an NYPD Sergeant shot Ms. Dalonda Stroble in the face with a CEW outside of her home in the Bronx. The NYPD sergeant gave no warning and there was absolutely no legal justification for shooting Ms. Stroble with the CEW. Ms. Stroble was never charged with any crime. (See *Stroble v. New York City et al*, SDNY, 16-CV-5144).

97. On or about May 14, 2016, an NYPD officer shot Ms. Linda Cesar in the chest with a CEW without any legal justification. Ms. Cesar suffered from mental health issues and lived in a transitional housing program (See *Cesar v. New York City et al*, SDNY 16-CV-7446).

98. On July 27, 2016, the NY Times reported on an incident from 2012 in which Mr. Mohamed Bah was shot and killed by NYPD officers. The NYPD officer opened fire at Mr. Bah after one of the officers on the scene shot another officer with a CEW, causing that officer to fall on top of another officer. Both of the officers felt an electric shock, causing one of the officers to shout to the other officers to open fire.

99. On or about November 2, 2016, an NYPD officer shot and killed Mr. Ariel Galarza with a CEW. Mr. Galarza was mentally ill and the NYPD officer shocked Mr. Galarza three times within a minute. The incident was reported by various media sources, including CBS and the NY Daily News

100. On February 15, 2017, the NY Daily News reported on an incident where Ms. Dailene Rosario, who was pregnant at the time, was shot with a CEW by an NYPD

officer at her home in the Bronx. This incident was recorded on video. All charges against Ms. Rosario were dropped.

101. On April 2, 2017, the NY Daily News reported on an incident in Brooklyn where two NYPD officers threatened to shoot a CEW at a number of teenagers who were walking away from the officers outside of their school. The incident was recorded on video.

102. A CCRB Report, issued in October 2016, identified 153 taser-related complaints from January 1, 2014, through December 31, 2015. From these complaints, six officers were the subject of two separate incidents, and one officer was the subject of three separate incidents. In 93% of these complaints, the victim was not armed or not reasonably believed to be armed. The CCRB report states that "a lack of clarity on when Taser use is appropriate both in the NYPD Patrol Guide and under New York Law may have led to excessive deference to officers involved in CCRB Taser-related complaints."

103. The CCRB Report references a complaint in which a young man was shot in the back with a CEW by NYPD officers because the young man walked past the officers when they told him he was under arrest for an open warrant, having given the man a ticket for riding his bike on the sidewalk. The officers then tackled the man to the ground and applied the CEW in touch-stun-mode for two more cycles.

104. In addition, the NY Times reported on December 26, 2016, that language and recommendations regarding the use of CEWs on unarmed individuals had been removed from the CCRB Report after the Report had been reviewed by the NYPD and City Hall.

105. It is undisputed that in situations where police officers mishandle the deployment of CEWs, citizens frequently suffer a deprivation of their constitutional rights under the Fourth and Fourteenth Amendments to United States Constitution.

106. New York City's failure to properly train and supervise DHS Sergeant McCraw with respect to the deployment of CEWs was a substantial factor in the deprivation of Plaintiff's constitutional rights.

107. In addition, this practice of officers mishandling situations where CEW's are deployed, as detailed above, is so consistent and widespread that a supervising policy-maker must have been aware of it.

108. New York City knew or should have known that this practice would likely result in constitutional violations of individuals, such as Plaintiff.

109. New York City was a final decision maker and, as a matter of practice and policy, has acted with a reckless indifference to Plaintiff's constitutional rights.

110. As a result, Plaintiff has been damaged in an amount believed to equal or exceed the jurisdictional limit of this Court.

### SEVENTH CAUSE OF ACTION

(42 USC 1983 – Monell Claim – Practice and Policy: 'Testilying')

111. Plaintiff repeats and realleges each of the preceding allegations of this Complaint as if fully set forth herein.

112. New York City has a practice and policy of officers fabricating evidence and making false statements under oath, known as 'testilying'.

113. This practice and policy has been widespread for many years and has been well documented throughout the media, including The New York Times, WNYC, and the New York Daily News.

114. In 2018, Detective Michael Foder pled guilty to perjury in the United States District Court for the Eastern District of New York ("EDNY"), having fabricated evidence and given false testimony under oath in a case from 2016. Detective Foder testified in the EDNY in 2016 that a witness had made a positive identification based on a photo-line-up that Detective Foder had shown the witness. However, it later transpired that Detective Foder had doctored the photo line-up, as the photographs he claimed to have shown the witness had not been taken on the date of the line-up. The NYPD commissioner, James P. O'Neill, stated that Detective Foder had been "willfully giving false testimony."

115. Another officer, Detective Kevin Desormeau, was convicted of perjury in New York Supreme Court in April 2018, having given false statements under oath in a case from 2014. Detective Desormeau claimed to have personally witnessed a hand-to-hand drug deal in Brooklyn. However security camera footage demonstrated that Detective Desormeau was lying and had fabricated his testimony.

116. In addition, Detective Desormeau's partner, Detective Sasha Neve, pled guilty to perjury charges in New York Supreme Court in June 2018, having fabricated sworn statements in a number of arrests in 2014.

117. In 2014, NYCDHS Sergeant Christopher Robinson made sworn statements relating to an incident at the Schwartz Shelter on Wards Island involving an inmate named Kevin Rosado. CCTV footage of the incident, reported by PIX 11 news, showed the

sworn statements made by Sergeant Robinson to be false, including statements made to EMS and in the Summons issued to Mr. Rosado. This incident was the subject of a lawsuit filed in the Supreme Court of the State of New York, County of New York, under index number 159462/2015.

118. In October 2019, former NYPD officer Elijah Saladeen was convicted of beating and dragging a 19-year-old homeless man, then lying about it to his superiors, to prosecutors, and in official documents. Officer Saladeen's claims that the man's injuries were self-inflicted were contradicted by Video Surveillance footage. He was found guilty of assault, attempted assault, and three counts of offering a false instrument for filing.

119. A review in 2015 by WNYC of more than one thousand criminal and civil court cases, and interviews with attorneys, turned up more than one-hundred-and-twenty officers with at least one documented credibility issue over the prior ten years.

120. A report published in March 2018 by The New York Times found that in at least twenty five cases, dating back to January 2015, "judges or prosecutors determined that a key aspect of a New York City police officer's testimony was probably untrue."

121. In 2011, Justice Gustin L. Reichbach of the State Supreme Court in Brooklyn, condemned a widespread culture of lying and corruption in the NYPD's drug enforcement units, stating that "this court was shocked, not only by the seeming pervasive scope of misconduct but even more distressingly by the seeming casualness by which such conduct is employed.'"

122. In 2017, Judge Weinstein, a Senior United States District Judge in the EDNY, stated that cases of false arrest "are becoming increasingly difficult to try fairly"

because "jurors are ever more aware of stories in the media reporting police officers lying to justify false arrests and to convict criminal defendants." The Judge went on to state that "one commentator discussing police officer veracity indicates: some experts on police practice treat lying by police at trials and in their paperwork as the "norm," "commonplace," or "routine."" (See Cordero v City of NY, 282 F Supp 3d 549, 554 [EDNY 2017]).

123. This practice and policy of officers fabricating evidence and making false statements under oath, as detailed above, is so consistent and widespread that a supervising policy-maker of New York City must have been aware of it.

124. New York City knew, or should have known, that this practice and policy of officers fabricating evidence and making false statements under oath, directly results in individuals suffering a deprivation of their constitutional rights, such as Plaintiff.

125. New York City was a final decision maker and, as a matter of practice and policy, has acted with reckless indifference to Plaintiff's constitutional rights.

126. As a result, Plaintiff has been damaged in an amount believed to equal or exceed the jurisdictional limit of this Court.

### EIGHTH CAUSE OF ACTION

(42 USC 1983 – Monell Claim – Deliberate Indifference: Failure to Train, Supervise, and Discipline)

127. Plaintiff repeats and realleges each of the preceding allegations of this Complaint as if fully set forth herein.

128. As detailed above, there has been a widespread pattern of officers in New York fabricating evidence and making false statements under oath.

129. Despite this widespread pattern, New York City has failed to take the steps necessary to properly train, supervise or otherwise instruct its officers, including DHS Officer Horton, to prevent officers from fabricating evidence and making false statements under oath.

130. New York City knew, or should have known to a moral certainty, that officers, such as DHS Officer Horton, have to give sworn statements under oath.

131. New York City knew, or should have known, that the correct training and/or supervision could have prevented officers such as DHS Officer Horton from fabricating evidence and making false statements under oath.

132. In addition, New York City has consistently failed to discipline those officers who have fabricated evidence and made false statements under oath.

133. There are a number of officers who have been promoted within the NYPD and NYCDHS despite having been found to have fabricated evidence under oath.

134. In 2013, Officer Konrad Zakiewicz gave testimony in a criminal prosecution in the EDNY. In that case, the Judge stated that the "Court finds the officers' observations, particularly those of Officer Zakiewicz, inherently and transparently false" and "the Court need not even resort to the officers' seriously damaged credibility to find their testimony here lacks honesty." Despite this, Officer Zakiewicz was later promoted to detective.

135. In October 2017, Officer Nector Martinez was found to be non-credible by the judge in a gun-possession trial, where video surveillance footage showed Officer

Martinez's testimony to be false. Despite this, Officer Martinez was later promoted to the rank of detective.

136. Police Officer Sean Kinane was also promoted to detective in 2017, even though a federal judge the year before had said his testimony in a drug case was "unreliable" and "not credible."

137. In March 2017, NYPD Inspector Christopher McCormack was promoted to Deputy Chief, despite that fact that a judge rejected the account of an arrest given by Inspector McCormack in Court in 2016, with the judge concluding that little of his testimony was credible.

138. The Civilian Complaint Review Board (CCRB) records and investigates instances of officers making false statements. According to an investigation by The New York Times, which tracked eighty-one cases from 2010, the CCRB has been notified of only two cases in which the NYPD Internal Affairs Bureau upheld the board's accusation that the officer had made a false statement. In the other seventy-nine cases, the NYPD found no wrongdoing or found the officer guilty of lesser misconduct, such as failing to properly fill out a memo book. Richard Emery, former chair of the CCRB, said that "there didn't appear to be any disciplinary consequences for cases where it seemed black and white that the officer was not telling the truth."

139. New York City knew, or should have known, that this practice and policy of officers fabricating evidence and making false statements under oath, directly results in individuals suffering a deprivation of their constitutional rights, such as Plaintiff.

140. New York City was a final decision maker and, as a matter of practice and policy, has acted with a reckless indifference to Plaintiff's constitutional rights.

141. As a result, Plaintiff has been damaged in an amount believed to equal or exceed the jurisdictional limit of this Court.

## JURY DEMAND

142. Plaintiff demands a trial by jury.

WHEREFORE, Plaintiff respectfully requests that the court enter a Judgment against Defendants together with costs and disbursements as follows:

> In favor of Plaintiff in an amount to be determined by a jury, but at least equal or exceeding the jurisdictional limit of this court for each of Plaintiff's causes of action;
>
> Awarding Plaintiff punitive damages in an amount to be determined by a jury;
>
> Awarding Plaintiff reasonable attorneys' fees, costs and disbursements of this action;
>
> And such other and further relief as the Court deems just and proper.

Dated:      New York, New York
            December 18, 2019                              /s/
                                            Malcolm Anderson (MA 4852)
                                            PetersonDelleCave LLP
                                            Attorney for Plaintiff
                                            233 Broadway, Suite 1800
                                            New York, NY 10279
                                            (212) 240-9075